UNITED STATES, PLAINTIFF *v.* JAC NATORI CO., LTD., DEFENDANT

Court No. 90–08–00445

(Decided July 14, 1995)

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice *(John Warshawsky)* for the plaintiff.
*Irving A. Mandel* and *Jeffrey H. Pfeffer; Thomas J. Kovarcik,* of counsel, for the defendant.

## OPINION AND ORDER

AQUILINO, *Judge:* The trial of this case brought by the government pursuant to 28 U.S.C. § 1582 to recover penalties and duties under 19 U.S.C. § 1592, though conducted by able attorneys, failed to focus completely the picture begun to develop during the pretrial stage and reflected in slip opinions of the court numbered 93–70, 17 CIT 348, 821 F.Supp. 1514, and 93–201, 17 CIT 1126, 836 F.Supp. 889 (1993), familiarity with which is presumed. The consequences of this failure must be borne by the parties in the manner discussed hereinafter.

### I

The few facts uncontested are set forth in the pretrial order, to wit: The defendant, which is now known as The Natori Company, is a New York corporation with its principal place of business in New York City which was engaged in sales of women's apparel—daywear, nightwear and undergarments—imported into the United States after the company first purchased and shipped raw materials therefor to manufacturers overseas, primarily F.F. International Mfg. Corp. ("FFI"), situated in the Republic of the Philippines. During the time of the entries in this case, importation into the United States of such apparel from that country was subject to a bilateral textile agreement and could not occur without a visa.

### A

The general rule of the Tariff Act of 1930, as amended, is that

no person, by fraud, gross negligence, or negligence—

> (A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of—

> (i) any document, written or oral statement, or act which is material and false, or
> (ii) any omission which is material * * *.[1]

The act provides per 19 U.S.C. § 1592(c) for monetary penalties commensurate with the degree of violation of this rule. Moreover, whether or not a penalty is assessed for a violation, if the United States has been deprived of lawful duties, they shall be restored. 19 U.S.C. § 1592(d).

Armed with these statutory provisions, the plaintiff prays that the court concur with the conclusion of the U.S. Customs Service that defendant's entries numbered 85–500211–4, 85–500208–8, 85–500152–6, 85–500207–5 and 85–500234–7 were the result of gross negligence, thereby subjecting it to a penalty of $32,859.04. In the alternative as to those entries, the plaintiff seeks a penalty of half that amount if the court concludes that the defendant was only negligent.

Consonant with its complaint as originally filed, the plaintiff continues to maintain that investigation of the afore-numbered entries led Customs to audit defendant's accounts for prior years which

> revealed that Jac Natori knowingly made false statements, acts, and/or omissions which resulted in the [   ] entry or introduction of merchandise into the commerce of the United States by means of fraud and in violation of 19 U.S.C. § 1592(a). Specifically, the 93 consumption entries presented by Jac Natori understated the amounts payable by Jac Natori to FFI, which manufactured women's apparel from raw materials supplied by Jac Natori; failed to disclose purchases of materials and services ("assists") provided by Jac Natori to FFI; and failed to disclose additional costs with regard to purchases from FFI, which were recognized through adjusting journal entries prepared by Jac Natori's accountants at the end of each fiscal year.

Pretrial Order, Sched. D–1, pp. 3–4. By the time of its closing argument at trial, the plaintiff prayed for recovery of a penalty on this claim of fraud in an adjusted, aggregate amount of $4,656,576.00.

Finally, the plaintiff takes the position that the defendant deprived Customs of lawful duties, the total of which was also adjusted during the trial to now be $832,846.00, which it seeks to recover pursuant to 19 U.S.C. § 1592(d).

## B

The next section of this statute, 1592(e), provides that, in a case such as this,

> (1) all issues, including the amount of the penalty, shall be tried de novo;
> (2) if the monetary penalty is based on fraud, the United States shall have the burden of proof to establish the alleged violation by clear and convincing evidence;

---

[1] 19 U.S.C. § 1592(a)(1). The exception to this general rule is that "[c]lerical errors or mistakes of fact are not violations * * * unless they are part of a pattern of negligent conduct." 19 U.S.C. § 1592(a)(2).

(3) if the monetary penalty is based on gross negligence, the United States shall have the burden of proof to establish all the elements of the alleged violation; and

(4) if the monetary penalty is based on negligence, the United States shall have the burden of proof to establish the act or omission constituting the violation, and the alleged violator shall have the burden of proof that the act or omission did not occur as a result of negligence.

Effective February 13, 1984, Customs amended its regulations relating to penalties, defining the degrees of culpability governing this case as follows:

(1) *Negligence.* A violation is determined to be negligent if it results from an act or acts (of commission or omission) done through either the failure to exercise the degree of reasonable care and competence expected from a person in the same circumstances in ascertaining the facts or in drawing inferences therefrom, in ascertaining the offender's obligations under the statute, or in communicating information so that it may be understood by the recipient. As a general rule, a violation is determined to be negligent if it results from the offender's failure to exercise reasonable care and competence to ensure that a statement made is correct.

(2) *Gross Negligence.* A violation is determined to be grossly negligent if it results from an act or acts (of commission or omission) done with actual knowledge of or wanton disregard for the relevant facts and with indifference or disregard for the offender's obligations under the statute, but without intent to defraud the revenue or violate the laws of the United States.

(3) *Fraud.* A violation is determined to be fraudulent if it results from an act o[r] acts (of commission or omission) deliberately done with intent to defraud the revenue or to otherwise violate the laws of the United States, as established by clear and convincing evidence.

T.D. 84–18, 18 Cust. Bull. & Dec. 58, 81–82, 19 C.F.R. part 171, App. B(B) (1984).

## C

Not only does the burden of proof vary in accordance with the degree of statutory culpability as indicated, the period of time delimiting claims for the respective penalties differs as well. That is, as discussed in slip op. 93–70, 17 CIT 353–55 at 821 F.Supp. at 1519–21, that period for plaintiff's claims of gross negligence or negligence was five years "after the date the alleged violation was committed", as opposed to "five years after the time when the alleged [fraud] was discovered". 19 U.S.C. § 1621 (1990).

This case was timely commenced insofar as the afore-numbered, five entries are claimed to have been the result of either gross negligence or negligence. The court also concludes that the plaintiff has borne its burden of proof that it commenced this case within five years of discovery of

what it maintains were fraudulent earlier entries[2] on the part of the defendant.

With regard to the claim for recovery of lost duties, this court remains of the opinion that it is not subject to any statute of limitation. *Compare* Slip Op. 93–70, 17 CIT at 354–55, 821 F.Supp. at 1520–21, *with* North American Free Trade Agreement Implementation Act § 668, Pub. L. No. 103–182, 107 Stat. 2057, 2216 (1993), *and* H.R. Rep. 361, part 1, 103rd Cong., 1st Sess. 152–53 (1993).

## II

The evidence adduced at trial convinces the court that the defendant was and is guilty of gross negligence as charged in regard to its entries numbered 85–500211–4, 85–500208–8, 85–500152–6, 85–500207–5 and 85–500234–7. Upon their arrival at John F. Kennedy International Airport in New York from the Philippines, a Customs inspector spotted and reported "significant discrepancies"[3] between the paperwork and the actual contents. Additional inspectors then inventoried the shipments and logged the contents found as compared to each entry. *See* Tr. at 18. The discrepancies were confirmed in every instance. *See id.* at 24. At trial, an inspector testified that

> one of the boxes in particular had a mark on the side which appeared to be an "X" in a circle. * * * [U]pon opening the box[,] * * * near the top or just under a few garments or a piece of cardboard were a variety of envelopes. * * * [P]acking lists were found inside each of the envelopes that were labeled as the actual packing lists.

> *    *    *    *    *    *    *

> [A]s noted on the envelopes, the phrase * * * "Actual Packing List" inferred that the packing lists supplied to Customs were not necessarily the real ones and upon looking at the form inside the envelopes it appeared to describe what would be declared and what would be actual quantities within given boxes for given invoices.[4]

Customs called upon its import specialist for the Philippines at JFK to investigate further. She testified at trial to general familiarity with Natori imports at the time of that assignment and that she too went through all of defendant's boxes, examining and counting every single garment, and comparing the contents found with the entry and the packing papers. *See id.* at 207. The goods were ordered seized. The import specialist also paid a visit to defendant's New York office and interviewed two of its officers. Her report of that visitation has been

---

[2] In reaching this conclusion, the court notes in passing that any claim for penalties as to those entries based upon either gross negligence or negligence would be time-barred.

[3] Trial transcript ("Tr"), p. 17.

[4] *Id.* at 25, 26. Plaintiff's exhibit 5 contains copies of the envelopes and packing slips for four of the entries, with the slips indeed subdivided into sections entitled "Declared Quantity", "Store Label Quantity" and "Actual Quantity".

The court finds that the total set forth as the declared quantity matched that for the actual quantity on only five of the 41 packing slips depicted in the exhibit. Twenty-six had different numbers for declared and for actual, while the remaining ten packing slips did not set forth any declared amount, only actual.

received in evidence as part of plaintiff's exhibit 13. Among other details, the defendant is portrayed therein as a young business "growing at an alarming rate."[5] Incorporated by one Josie Natori, who not only has been characterized as "the prime designer of better intimate apparel"[6], she is quoted as claiming necessary "understanding of the mechanics of business, of economics and cash flow."[7] According to her husband, Mrs. Natori chose to import "because she was aware of the quality of hand work available in the Philippines." Plaintiff's Exhibit 13, second page. Moreover:

> When Mrs[.] Natori went into business she could not find a factory which could keep up with the production or the quality she required for her merchandise. As a result her father [Felipe Jose] Cruz along with 12 to 14 other shareholders founded F[FI]. Mr. Cruz, the princip[al] shareholder in F[FI,] is Mrs. Natori's and Ms. Cruz's father. * * * Mr. Cruz is the financial backing and the financial advisor for F[FI] in the Philippines. Mr. Natori stated that Mr. Cruz does not take a salary, per s[e], from F[FI,] but payments are made to an account in Mr. Cruz's name in the United States.[8]

At trial, the defendant sought—unsuccessfully—to dispel the appearance of wanton disregard of the requirements of the law. It called to the witness stand from Manila FFI's general manager, Roberta Escudero, who admitted that from January through August 1985 "[w]hatever we shipped out didn't tally with the visa that was granted to us for that shipment." Tr. at 343. Each entailed two packing slips, the first setting forth the quantity projected to comprise that shipment (and to be declared to governmental authorities). Then, as packing took place some time later, the count of the goods involved would be listed in the "Actual Quantity" section of a counterpart of the first slip. The court finds that the expectation of FFI was that Customs would be provided with the first, "Declared Quantity" version, while the second one, indicating the actual quantity or quantities, would be retrieved by the defendant upon deliverance in New York. Ms. Escudero sought to explain this approach as follows:

> By putting the declared quantity we're giving the packers a guide as to what to put in because not all the goods are finished when we would ideally want [them] to be finished. I mean you have cartons here in chronological order but these goods may not go down to the finishing section at the same time or in the order that we want [them] to. So this is a guide. * * * [W]hen they get in * * * six pieces, [they are] inspected [and] packed. We put in and mark six pieces. * * * This is how they receive the goods from the finishing inspectors. They put [them] in the cartons.

---

[5] Plaintiff's Exhibit 13, second page. *See* Tr. at 57; deposition transcript of Josie Natori, p. 85.

[6] Schiro, *Natori Planning to Cast Wider Net*, N.Y. Times, April 25, 1992, at 35, 36 col. 1.

[7] *Id.* at 35 col. 5.

[8] Plaintiff's Exhibit 13, third page. The exhibit indicates that Mrs. Natori's sister Angelita Cruz is defendant's vice president for production while her husband, Ken Natori, is chairman of the board. It was they whom the Customs import specialist interviewed for her report.

*Id.* at 375. The witness acknowledged that whoever prepared the bottom portion of the packing slips thus knew when the actual amounts shipped did not match those declared to the U.S. Customs Service in the entry documentation. *See id.* at 377.

During direct examination, counsel for the defendant also attempted to dispel the appearance of impropriety by establishing that there were instances when FFI undershipped (rather than overshipped) merchandise and that, if "netted out", the quantities "would be even or less than what we[re] declared". *Id.* at 344. Whatever the precise arithmetic, however, it in no way negates the fact that FFI knowingly misdeclared merchandise on the entry documents and did not obtain visas for all of the goods.

The issue thus before the court is whether this gross negligence can and must be imputed to the defendant. The government's position is that the "knowledge that FFI ha[d] regarding the difference between [the] quantity shipped and [the] quantity declared should be imputed to Natori" because the "concealed" packing lists were specifically intended for the latter. *Id.* at 440. Furthermore, it emphasizes the very close working relationship, familial and commercial, between FFI and the defendant.

The defendant counters that the shipments in 1985 "evidenced at most a mistake or error by the exporter" and notes that Customs inspected and seized the goods before Natori ever received them. *Id.* at 456. This argument is lame. The record reflects a relationship more than that of exporter—importer at arm's length. The evidence establishes, and the court finds, that the two essentially existed each for the other. Josie Natori's designs created in the United States were materialized by her father's firm in the Philippines for return to the American marketplace. And, during the period under consideration, FFI manufactured almost exclusively for the defendant, which, in turn, was the prime outlet for the fruits of FFI's labors.

In short, a preponderance of the evidence adduced at trial shows that entries numbered 85–500211–4, 85–500208–8, 85–500152–6, 85–500207–5 and 85–500234–7 violated the Tariff Act of 1930, as amended, and that the violations of the requirements of 19 U.S.C. §§ 1481, 1485 (1985) are attributable to the defendant directly and/or through its having aided and abetted its foreign manufacturer/supplier in derogation of 19 U.S.C. § 1592(a)(1). And the court concludes that those violations were the result of gross negligence.

The Tariff Act provides for imposition of penalties for such conduct up to maximums, the calculation of which is prescribed in that statute.

Depriving the United States of lawful duties by reason of gross negligence, for example, is

> punishable by a civil penalty in an amount not to exceed—
>> (A) the lesser of—
>>> (i) the domestic value of the merchandise, or
>>> (ii) four times the lawful duties of which the United States is or may be deprived * * *.

19 U.S.C. § 1592(c)(2). In this case, the plaintiff claims duties lost on the afore-numbered entries in the total amount of $8,214.76.

In light of the foregoing facts and circumstances of those entries, the court concludes that the defendant is not entitled to any mitigation of the maximum, permissible punishment. Hence, the plaintiff should be awarded four times the amount of the deprived duties or $32,859.04, which sum the record indicates is less than the domestic value of the goods to which the duties apply.

### III

The record also shows, and the court finds, that the method of importation punishable per the foregoing part II was practiced years earlier. Defendant's shipping clerk from 1977 to 1983 and then operations manager from 1984–88 admitted that since at least 1981 he was aware of quantity discrepancies between that which FFI actually shipped and the amounts which were declared to Customs. *See, e.g.*, Tr. at 259. Despite this knowledge, the defendant never attempted to reconcile the differences with the Service. *See, e.g., id.* at 261.

### A

As pointed out in part IA of this opinion, the investigation by Customs included an audit of the Natori—FFI accounts for 1981 and 1982 performed by a member of the Service's Regulatory Audit Division. Among the records reviewed were Natori's accounts-payable ledger for FFI, copies of the consumption entries and invoices, the purchases journal, and company accountant's adjusting entries.

A typical page in the accounts-payable ledger, which was introduced into evidence as plaintiff's exhibit 6, is formatted as follows:

Looking left to right, the first column references months of the year (1981), the second FFI invoices, the third column FFI's apparent "actual" cost of producing the merchandise covered by each invoice, the fourth schedules dollar amounts for each, and the final column lists the balances between the figures in the preceding two.

The linchpin to plaintiff's allegation of fraud is that the numbers in the last one are amounts due and owing FFI by the defendant. At trial, the Customs lead auditor, Eugene G. Donohue, testified:

> An accounts payable ledger records the liability that is owed by a company to the people that it purchases goods and services from,

and it records the amount that is owed to that company at any given time.

Tr. at 68. He explained that when he cross-referenced the columns in that ledger with the consumption entries and invoices for 1981 and 1982 provided by the defendant[9], he found that the amounts on the entry documents matched, with few exceptions, those in the "LC" column. Mr. Donohue concluded therefore that that column encompasses letters of credit, which represent both the declared values of the imported merchandise and the amounts paid by the defendant to FFI. However, since the purpose of an accounts-payable ledger is to record liabilities, he concluded that the last column represents not only the amounts still owed FFI by the defendant but also undeclared dutiable values. To calculate the total of those values he simply tallied the balances for each invoice for the year under audit.

Despite defendant's assurances that the last column represents "variances", a term of art used in cost accounting for the difference between the actual and the estimated (or standard) costs of a manufacturer, and not balances owed to FFI, Mr. Donohue adhered to his opinion. He submitted that a non-manufacturing entity like the defendant would have no incentive to maintain a standard cost-accounting system. *Id.* at 93. According to him, a

> standard costing system is a method of accumulating information from management to control the manufacturing operation. Basically, [for] an operation that produces similar type items repeatedly, a study is performed by management to determine what those items should cost. They use budgeting practices, comparison of labor rates, labor hours, time and motion studies, to prepare a budget for preparing a standard cost sheet for the items that they manufacture which would come up with an optimum cost to be recorded when an item is produced. These costs are then used throughout the period and periodically reviewed and compared to the actual amounts that are being incurred. And the differences between the actuals and the standards are booked to variance accounts. * * * [Y]ou would then use this information when setting your new budgets for the standard.

*Id.* at 91–92. Such a system would be accompanied by a "list of standards that have been set with cost sheets for the products that are being produced and what amounts they budgeted for the standard" in addition to documentation of the actual costs incurred and resulting variances. *Id.* at 92. As a purchaser of finished products, this information would be of little use to the defendant. Moreover, Mr. Donohue asserted that it not only failed to produce any records or reports consistent with a standard cost-accounting system, the ledger itself does not reflect the terms of art used in such a system:

---

[9] *See* Plaintiff's Exhibits 1 and 2.

\* \* \* When you look at the accounts payable ledger \* \* \*, other than the word "Actual," there's no indication at all of a standard costing system. The LC amount is the amount paid by LC. In a standard costing system you identify that the amounts being shown under the LC was a standard and it would stay standard. And you certainly wouldn't describe the difference between that and the Actual as balanced. Whereas, in an accounts payable ledger you would describe the difference as balance owed.

*Id.* at 98. These reasons, coupled with the magnitude of the "balance" column, left the witness convinced that defendant's records do not evidence a standard costing system.[10]

The Customs audit also covered defendant's purchases journal for 1981 and 1982[11], which recorded the amounts paid for both supplies and finished goods. From those entries, Mr. Donohue recorded all of the purchases which could have been from suppliers of raw materials and assumed that they were for FFI. *See* Plaintiff's Exhibit 17. He did so upon the failure of the defendant to provide any alternative explanation for the purchases. *See* Tr. at 104–05. He totalled the amounts for both years and considered the result to represent assists to FFI and therefore additional undeclared dutiable value.

Lastly, Mr. Donohue examined the adjusting entries of defendant's accountant. *See* Plaintiff's Exhibit 11. He recorded only those which appeared to have an impact on purchases and accounts payable and any "large unexplained adjustments to either of th[em] and to the inventory account that Natori maintained." Tr. at 108. He totalled those amounts and concluded that they constituted additional undeclared value. During his testimony, Mr. Donohue revised his audit results, excluding two of the adjusting entries originally considered such value. *See id.* at 110, 114. He totalled the balance amounts in the accounts-payable ledger, the undeclared "assists" in the purchase journals and the adjusting entries to reach his sum of undeclared dutiable value of $2,374,927.00. *See* Plaintiff's Exhibit 16.

### B

The defendant attempts to buttress its position that the last column in the accounts-payable ledger for 1981 and 1982, plaintiff's exhibit 6, does indeed reflect "variances" as follows:

Because FFI and Natori had a close, ongoing relationship which required that cost and price estimates be as accurate as possible for both parties, FFI furnished its actual figures for cost of production plus profit to Natori at various times, sometimes orally and sometimes in writing \* \* \*. FFI used that information to try to improve

---

[10] Mr. Donohue noted in both his written audit report and at trial the existence of a bank account at Morgan Guaranty Trust Company in New York entitled JAZFEL. Apparently, this account was for Felipe Cruz, into which deposits were made by the defendant. *See* Tr. at 63–64; Plaintiff's Exhibit 17, p. 1. While Mr. Donohue did not include them in the total amount of undeclared dutiable value, he stated that "at the time the report was prepared we just wanted to acknowledge that there's a possibility that transactions in that account would also have an impact on undeclared dutiable value." Tr. at 64.

[11] *See* Plaintiff's Exhibit 7.

the accuracy of its future cost estimates * * *. Natori could use the information to estimate the prices that it would have to pay FFI and could charge its customers for future merchandise.[12]

In other words, the balance column does not represent, as the plaintiff asserts, the true dutiable value of the merchandise because the defendant never paid the listed amounts to FFI. Furthermore, the defendant argues that the plaintiff does not "present any credible evidence that such variances were part of a pattern of false statements made by Natori in violation of § 1592." Defendant's Memorandum, p. 15. Rather, the variances occurred due to a number of factors, including design changes and natural calamities. *See, e.g.*, Tr. at 333.

Similarly, the defendant asserts that the plaintiff has failed to substantiate its theory that Natori provided undeclared assists to FFI. In particular, the government does not show that the raw materials purchased by the defendant in 1981–82 were not used by a firm by the name of Kefco Apparel Corp., which was engaged in manufacturing operations at the time. Defendant's Memorandum, p. 17. *See also* Tr. at 464–65. As to the third category of undeclared dutiable value, the adjusting entries, the defendant challenges the inclusion of all but four—numbered 16 and 24 (except 1980 portion) for 1981 and 29 and 36 for 1982.

## C

In contrast to gross negligence, fraud must be established by clear and convincing evidence, which is a more exacting standard than a fair preponderance. The plaintiff asserts that Natori's financial records for 1981–82 are sufficient proof that the defendant engaged in a deliberate plan to undervalue its merchandise and thus defraud the United States of lawful duties.

This court cannot concur. While the plaintiff presents a plausible theory, it has not adduced evidence conclusive of the claimed degree of culpability.[13] There is no proof that the defendant ever actually transferred the amounts listed in the last column of its accounts-payable ledger to either FFI or the JAZFEL account. *See, e.g.*, Tr. at 335, 372–73. By way of comparison, in both *United States v. Thorson Chemical Corp.*, 16 CIT 441, 795 F.Supp. 1190 (1992), and *United States v. Modes, Inc.*, 16 CIT 879, 804 F.Supp. 360 (1992), the defendants had prepared two invoices, with differing values, for the same imported merchandise and presented those with the lower numbers to Customs. In both cases, however, the government proved that the importers did pay their exporters the higher amounts, and they were thus found guilty of fraud.

Furthermore, there is no clear and convincing evidence that the defendant supplied FFI with assists within the meaning of 19 U.S.C.

---

[12] Defendant's Memorandum of Law in Support of Motion for Partial Summary Judgment, p. 12. *See also* Tr. at 335, 353.

[13] This is not to say that the record does not reflect unorthodox accounting practices for a non-manufacturing entity, just that, standing alone, they do not convince the court that they were deliberately done with intent to defraud the revenue or to otherwise violate the laws of the United States.

§ 1401a. Mr. Donohue explained at trial how he chose which entries in defendant's purchases journal to include as undeclared dutiable value:

> * * * [W]e took all the purchases from any of the companies that we deemed could be a supplier of raw materials because when we asked to see the invoices involved to review them for a determination of what was being bought from * * * the suppliers no explanation was forthcoming * * *. Since Jac Natori told us they didn't have a manufacturing operation in the United States[14], we made the determination that all purchases would be considered as having been shipped to FFI.

Tr. at 104–05. The plaintiff urges the court to accept this determination and include the purchases of raw materials as undeclared dutiable value. The inference(s) to be drawn from the journal thereof, however, are simply too weak for this court to conclude that the plaintiff has clearly and convincingly proven fraud by that evidence alone. Admittedly, it raises questions, but the answers are not that clear from the record the plaintiff has developed. This is also true with regard to the last category of alleged undeclared dutiable value, the accountant's adjusting entries. While some of them do appear to represent additional dutiable value, there is little indication that those entries were part of any scheme to defraud the United States of revenue.

In sum, the plaintiff has not met its burden of proof as to count III of its complaint, charging fraud.

### IV

The burden of proof which applies to plaintiff's demand for lost duties on the goods covered by that count is not as onerous. In order to prevail, plaintiff's evidence need fairly preponderate, which simply means outweigh that which the defendant has offered in opposition. Stated another way, to establish a fact by a fair preponderance of the evidence means that a proposition is more likely true than not true. And the court finds that the plaintiff has met this burden, in significant part, on count IV of the complaint.

Of the 91 entries recorded in defendant's accounts-payable ledger for 1981 and 1982, all but 14 are in its favor. While some are relatively small, the majority are notable sums, significant multiples of the price apparently paid to FFI by the defendant. See Plaintiff's Exhibit 6. This two-year pattern, beneficial to the defendant, at a minimum bespeaks negligence.

Defendant's attempt to blame the discrepancies on design changes or "monsoons" and "epidemics * * * of redeye, cholera, thyphoid, H fever, and Hepatitis B"[15] is of no avail. While such phenomena may have been real and thus had some impact, they should not have diseased two years' worth of entries. Indeed, FFI's Ms. Escudero, the person bearing direct

---

[14] The defendant maintains, however, that Kefco Apparel Corp. was, in fact, engaged in manufacturing for it in 1981 and 1982 and during those years "manufactured approximately 10%–25% of the wearing apparel sold by Natori." Defendant's Memorandum, p. 17, citing deposition transcript of Josie Natori, p. 29. See also Tr. at 464–65.

[15] Tr. at 333.

witness to those kinds of occurrences as well as to costing at that firm, admitted that some of the discrepancies are "significant" and "unusually large". Tr. at 356, 357. They represent undeclared value upon which duties must be paid. As the court of appeals has held in *United States v. Blum,* 858 F.2d 1566, 1569 (Fed.Cir. 1988), the authority of the United States to recover lost import duties under section 1592(d) is not delimited by actionable violations of subsection (a) of that statute. And, while Customs has ruled that variances, in general, are not taken into consideration in calculating transaction value, the stated exception thereto was "unless they are significantly and consistently in favor of the importer"[16], which definitely is true here.

In addition, this court has reviewed the accountant's adjusting entries and finds the following additional dutiable value previously undeclared: With regard to 1981, the defendant does not challenge the inclusion of adjustment entry 16, which reflects an additional amount owed to FFI for purchases. Similarly, adjusting entry 24 records "additional unrecorded purchases" and "unrecorded balances" owed FFI, save the amount labelled "1980 Adjust purchases understated". Finally, 1982 adjusting entry 36 entitled "additional 5% override on goods purchased from FFI—Phillippines [*sic*]" also represents additional undeclared value.[17] The court cannot, and therefore does not, reach the same conclusion as to any of the other adjusting entries.

V

In accordance with the foregoing findings of fact and conclusions of law, the plaintiff is entitled to recover on the first and fourth counts of its complaint, and the parties are hereby directed to settle and present to the court a proposed form of judgment thereon within 30 days hereof.

---

[16] Exhibit H, first page to Affirmation of Jeffrey H. Pfeffer, Esq.

[17] *See* Plaintiff's Exhibit 11, third, fifth and eleventh pages.